The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention for the court is now admonished. We have four cases on for hearing this morning. First is 23-1905, Kim v. Cedar Realty Trust. Mr. Heffner. Thank you, Your Honor. May it please the court. This case involves the district court's dismissal of the plaintiff's complaint at the pleading stage. It was unwarranted and in error for three reasons. There are three claims that the plaintiffs made at the pleading stage that clearly should not have been dismissed. The first is a contract interpretation issue. The second is a cause for implied covenant of good faith and fair dealing, and the third is a breach of fiduciary duty claim against the directors of the corporation. The facts here, I'll be brief, involve a corporation, a REIT, Real Estate Investment Trust, that had common shares and preferred shares. It had a board that had $40 million worth of stock in the corporation that could be, that would be realized under the transaction contemplated. The defendants put together a plan to intentionally structure a deal that would liquidate all of the assets of Cedar via two sales, distribute those proceeds to the common shareholders, including the $40 million mentioned to the directors, and freeze the preferred shareholders into a non-traded private company held exclusively by Wheeler. Wheeler being, as alleged in the complaint, an undercapitalized, leveraged-to-the-hilt, and poorly managed REIT. What your colleagues on the other side say is that what they did is, what the directors and the executives in this case did, is consistent with their fiduciary duty to maximize value for the common shareholders. Do you disagree that they had that duty? We think they might have been put themselves into a conflicted position. Why is that? Because they owe duties both to the common shareholders, they do, they owe duties to the corporation under Maryland law, under the statute, and they also owe fiduciary duties to the preferred shareholders. Well, my understanding is that to the extent that they owe duties to the preferred shareholders, it would be duties that would not otherwise be contemplated by the terms of the contract. And in this case, you've got the articles which define what happens when there's a change of control, and that's a contractual arrangement, not a fiduciary one, right? So, what did they do that breached that contract? Sure. So, one of the issues, I think the most salient issue that I can point to that's outside of the terms of that change of control provision would be that they froze the preferred shareholders into a privately held company that now makes it impossible for them to exercise their change of control rights in the future. I don't understand. You know, you could have simplified this case quite a bit, and I must say that the briefing didn't help me a lot. The documents helped me much more. But as I understand this transaction, Cedar was essentially merged in. All its assets were sold, first in the initial transaction to a third party, and the rest were issued on stock, which had cash calls on them, essentially liquidating all of the assets. The cash call, part of it was loan money from Wheeler. But in the end, all the cash in the corporation was distributed to the common stockholders without any distribution to the preferred. Now, the very first page of your document says that rank, the preferred on any declaration of dividends, gets paid first before the common stockholders. And then you go to these other things that you're, these very, what I would call a difficult language later in the document talking about a change of control or liquidation. You don't seem to argue the liquidation as the long and short of your claim is basically the preferred were manipulated out of their preferred position so that they now have no preference. There's no assets in the corporation, and all the assets were distributed by way of dividend to common stockholders without recognizing the preferred. That's what your claim is. And you go through these contorted things, you breach a contract, this and that. We can talk about the contract, but it seems to me the document pretty clearly makes the preferred preferred stockholders, which means they get paid ahead of the common stockholders when there's a distribution of cash of the corporation. Your Honor, I couldn't agree with you more. Well, I know you couldn't, but your brief doesn't do a very good job on this. And you keep going into these, you seem to have abandoned your notion about liquidation. Tell me what liquidation is. I looked it up in Black's Law Dictionary, and liquidation said the sale of all assets. And so they say upon liquidation, the preferred get paid first. But then two paragraphs down, they define liquidation not to include the sale of all assets. Now, tell me what kind of a document that is. And where are the directors honoring their duty to make sure the preferred get paid first? Well, I mean, the preferred get paid dividends, not the cash from a sale of an asset. I mean, that's what their position would be. This wasn't a dividend payout. This was a This was a dividend payout, $29 per share. Well, that's what the contract says. But the question is whether or not this transaction is a dividend payout or a sale of assets, right? Either way I think Judge Niemeyer and I are arguing amongst ourselves. Why don't you make it clear? You know, I don't know if you have understanding of what your own documents provide. There was a sale of assets. The corporation had the cash, and it paid it out in a special dividend. That's correct. And they called it a special dividend. That's correct. All right. So the common stockholders got paid $29 a piece per share. That's correct. As a dividend. Correct. All right. Now there's a provision that says before any dividend could be paid to common stockholders, the preferred have to be paid. That's correct. Well, where are you saying that? Why aren't you saying that? Have you made that? I understand Judge Niemeyer is, you know, an excellent lawyer, and he might, you know, retire and come work for you. But have you made that argument? It's an interesting argument. It seems to be a novel argument, not one that I read in your briefs. We made that argument at the preliminary injunction stage. We made that argument in the lower court. And on this brief, we've decided to include it in the breach of fiduciary duty claims. It's part of the breach of fiduciary duty claim and part of... In what way? Point me to your brief where you make the argument. Can you tell me what page I should look at to see this? I understand Judge Niemeyer's argument, and he seems like he just wants to make a different argument than you do. It might well be a much better argument than you're making. But I don't want to consider an argument that you're not putting forward. You're the master of your argument, and this is an argument that I've not seen made yet. My immediate search through my brief comes to page 50, where we talk about here if the Director of Defense... 50 or 15? 50, 5-0, where we're discussing the LC Capital situation in terms of whether or not it includes a breach of fiduciary duty, comparing that case to this case. And in LC Capital, for example, there were a set of preferred shareholders who were paid their conversion rights, but they wanted more. They wanted more than what they were asking for. And the court said, no, they don't have a fiduciary duty to pay you more than that. And in that discussion, we say here if the Director of Defense had honored the conversion right or the liquidation preference, LC Capital would limit the payout to preferred stockholders to the sum dictated by the conversion right or the liquidation preference. That's one section. I can continue to go through. Again, we have not made that essential. The condition is that that's the argument, that's Judge Niemeyer's? You've taken that sentence to make Judge Niemeyer's argument? We're saying we used it, we used the fact that the defendants did not, that structured this transaction around the liquidation preference as evidence of a breach of fiduciary duty and why it distinguishes this case from the LC Capital case in Delaware. I need to correct one fact from Judge Niemeyer's formulation. The defendants were a little bit smarter than that. Had they sold all of these things directly, they would have obviously keyed off the liquidation preference. They were a little more wily than that. Instead, what they did is they left the bulk of the assets, about $850, $900 million worth off in one sale. Then they kept the worst properties around. Those are the remain co-properties as described in the merger agreement. We also call them the Wheeler properties now. That's what they used to package and sell. They did that so that they could have a remaining corporation in existence that they would call Cedar. They have a remaining, so they have before. Is your view that under the contract that that meant the liquidation provision was not triggered? No. Our provision, our statement was it was an effective liquidation. In the trial court, contractually. You agree it was not an actual liquidation because they kept the remain co-assets? I think you have to say technically there's still something left. The problem, of course, with that interpretation is when driven to its logical conclusion, they could have kept a penny in the company, kept the name, sold it, and said, ah, we didn't liquidate. See what we did? You chose to buy preferred shares under this contractual arrangement, right? That's correct. You could have chosen to say any time you sell 80% of the assets, it triggers a liquidation. Or any time you sell 70% of the assets, it triggers a liquidation. But that's not the agreement. Your Honor, it's absolutely true. You're right. The notion that we could have negotiated for is a legal fiction. I mean, these are stocks that are sold. There's no negotiation going on. But you're exactly right that that's how we have to treat it. I agree with that. Then the option is not to buy. That is the option not to buy. But that's not to say there aren't protections in there that cover the situation. There are. This is a change of control. Without a doubt, this is a change of control. But that's a different argument than Judge Niemeyer's argument, right? That is a different argument than Judge Niemeyer's. The change of control argument, we can talk about what is the surviving entity. I get that argument. Absolutely. But with respect to Judge Niemeyer's argument, you have to say that this was an effective sale of the assets, creating a liquidation preference, even though we know it was not an actual sale of the assets. Two things. Under a contractual claim that this was a liquidation keying off our liquidation preference, we would need to make it under the contract. And you're right. That's what we'd have to do. We have tried to subsume it in the breach of fiduciary duty claim. And we think we've alleged enough under there because that is a, it is a tort. It is fact specific. I understand that. And that needs to be sent down for the appellate or the trial court. I understand that. But what, but you agree that it's not an actual contractual claim. I understand the fiduciary duty argument. And we can talk about whether page 50 like adequately raises that. But it's not a contractual argument. There was no contractual liquidation triggered here. You agree with that. I agree that we have not argued that in this brief, that it is a contractual. That's not the issue in the case. The issue is whether your complaint stated plausible claim. That's correct. But your brief didn't start with your complaint and it didn't end with your complaint. I mean, I must say you seem to lose the forest for the trees. You keep arguing this. I would have argued in response to your claims in the brief, I mean, in the complaint that there were contractual violations and you alleged contractual violations. There were preferential rights granted in the documents to preferred stockholders. All the cash of the corporation was distributed. The stock was canceled. There's no stock left in the corporation. And the money, the loan money came down from Wheeler and was distributed to the common stockholders. That breached several provisions of the contract, but you don't seem to point them out. I mean, you deserve what you sort of argue, my guess is, but this case, your argument in this case is basically the preferential stockholders were left with zero. They have a contractual right against Wheeler, preferential right on Wheeler, but they have no more contractual right with respect to Cedar because Cedar is a hollow shell at this point. There are no stockholders. There's no corporate management. And you allege a lot of this in your complaint. We do. I appreciate, I think. You can argue with me, that's fine. Yeah, no, no, no. I think we've made a lot of those allegations both in the complaint. I don't understand on a 12B6 motion why you're not arguing that your complaint stated a plausible claim for relief. That's the case. Not what happened at trial. You're arguing as if you're going to a jury. I believe our complaint states that we plausibly pled claims for breach of contract. I've got a few of them right in front of me, but that to me is the whole issue in this case, 12B6. Do you allege, just to start, can you start with the one that Judge Niemeyer suggested that there's no stock in the Cedar anymore? Seems like to me that there is. As far as I know, there's one share of common stock held by Wheeler. The document says the stock was cancelled. Do you agree with that? Do you agree that all the common stock was cancelled, or do you agree that the common stock, whatever it is, is, in fact, held by Wheeler? Yeah. Okay. So, the initial Cedar. Will you answer that question? I'm interested in it. Which one do you want me to answer? I have three. I'll re-ask it. Is the common stock of Cedar exist, and if so, who owns it today? Okay. So, here's what happened. No, no, no. Start with the answer and then explain. Is there common stock in Cedar today? Yes. And who owns it? Wheeler. Now you can explain all you want to. They hold one share as a result of the transaction. The first step of the transaction was a sale of all the money. The second was the payout, as Judge Niemeyer has explained, of all the money, the cash, to the shareholders. They turned in their shares, and they were cancelled. And the payout of cash comes in two forms. It's the sale of some assets, and it's the Wheeler loan, right? Correct. A consideration for the merger. So, it's plus the loan that Wheeler takes out, which is effectively to buy Cedar. That's correct. And to put a finer point on it for the breach of fiduciary duty and the good faith and fair dealing claim, that loan is now applies to the assets left in the Cedar company. Okay? So, they're leveraged against my client's assets, driving down the value of those assets. So, but with respect to the fiduciary duty claim, as I understand the law is, preferreds are not left without a remedy in that context, but not if the terms of the contract that the preferred signed on to addresses the particular claim at issue. And in this case, at bottom, you're unhappy with the terms of the deal, the articles that allow this very transaction to go forward. And I get that, but I'm not sure how that makes up the claim for a breach of fiduciary duty when the contract explicitly contemplated this kind of transaction. Because they went above and beyond the contract. Again, they didn't just sell the company. They sold the company in a transaction that put it inside a private, privately held company that is completely controlled by Wheeler, which defeats two of our contractual protections going forward. One is we can't do a change of control, we can't make a claim for a change of control in the future if Wheeler sells the company because it's not traded publicly. And the formula in the very change of control section that the defendants claim is unambiguous, it states that in a stock and cash transaction, the way to compute the conversion formula has to be based on the trading of the stock. The stock has to be publicly traded. That formula becomes superfluous. It doesn't make any sense and it can't be applied if the defendant's interpretation is correct. And that violates a fundamental canon of Maryland contract construction and automatically makes that provision ambiguous. Mr. Heffner, you've gone a little bit over time, but you've been responding to questions. I'm going to hear from the other side. Thank you, Your Honor. Mr. Jay, could you start with that, what he just said, and tell me why it's wrong? So, thank you, Your Honor. May it please the Court. May I just, one housekeeping note about who's speaking to what, and I'm happy to answer your question. So, I'm William Jay, I represent the directors. I'm going to start with the contract and the fiduciary breach claims. Perfect. My colleague, Mr. Thrope, will do the other, the Wheeler claims and the implied covenant. So, to your question. So, the other side has argued that the text of the conversion formula tells you that the definition of a change of control is ambiguous. Don't think that that works. First, because even on the other side's view, there will be circumstances in which there plainly is no change of control, but in which Cedar is no longer traded on the New York Stock Exchange. So, in other words, if the other side's argument is nothing can result in Cedar not being traded on the New York Stock Exchange anymore without it being a change of control, that is just not how the provision is worded. So, let me give a concrete example. I think, I take the other side to concede that if Cedar merged into Wheeler, simple as that. So, Wheeler, a publicly traded company, right, so then you have, which is traded on the NASDAQ, not the New York Stock Exchange. So, then if you look at the text, right, the question is, does neither the corporation nor the acquiring or surviving entity have a class of common securities traded on one of the national markets? So, plainly, that would not be satisfied. So, Cedar would no longer have stock on the New York Stock Exchange, and I understand that if there were a conversion, there would be a question about how you'd compute it if the consideration were not just cash. But that's a pretty small tail on a The definition of a change of control focuses on whether the corporation or the acquiring or surviving entity has a class of publicly traded securities, and here it's Wheeler and here it does. And it matters not that this was a reverse triangular merger, right? It's still the same result. That's correct, because the, because Clause X is written in such a way that if, in any way in which another person acquires majority voting control of Cedar, so then Clause X is satisfied, and then you ask whether either Cedar or the acquiring or surviving entity has publicly traded securities. And here, Wheeler has publicly traded securities, and so the definition is not satisfied. There has not been a change of control. So, this is written so that the preferred shareholders, as some of the questions have brought out in the top side of the argument, their bargain was they bought preferred shares that get them first preference to dividends, but a fixed dividend, and that's all. No, so they get $1.63 per share per year. They don't get to share in extra profits if the company is extra profitable and declares a big dividend. They don't get to share in a, in a merger premium, and they don't get to vote on a transaction. Nor do they get to share in a partial sale of assets, right? That's exactly right, Your Honor. The, the, they don't have a voting right. That's not a liquidation, and I just want to point out that the other side in the district court had a claim, this is discussed at pages 408 to 410 of the district court's opinion, that this was in substance a liquidation. That was rejected. They didn't appeal it. So, that was their other breach of contract claim. I don't understand how that can be rejected, and they alleged it, and they have a plausible claim. I can make the claim. I, I'm not sure they point to the exact same paragraphs, but they alleged that there was a liquidation, and that there were a sale of assets, and that they weren't honored in that liquidation. All the stock, all the cash of the corporation was distributed to stockholders, and then their stock was canceled. Now, that is giving the common stockholders preference over the preferred, and they allege that in their complaint. So, I want to. Now, why, how can the district court reject that without a trial? Quite, quite simply, Your Honor, because of one, the other allegations, and two, the wording of the, of the agreement. And let, let me just say at the outset, that is not the claim that the other side is pressing here, as I think you heard my friend say a moment ago. They, the issue before this court is whether there was a proper dismissal, 12B6 dismissal of this complaint. And the, they raised all these points in the district court. They are arguing these same points a little differently. I think the liquidation and the preference to common stockholders is alleged under the breach of fiduciary arguments. They make that in their brief here on appeal. I don't think that's the best place to raise it myself, although I think the directors did have an obligation to honor the document, which was to not cut out the preference of the preferred. So I respectfully disagree that that's what the other side has raised, but let me answer your question. Because the allegations in the complaint make clear that the company, Cedar, retains assets. It is a going concern. And liquidation is defined. This is not a liquidation. So when you have the facts alleged in the complaint establishing that the company still has assets, and when the agreement says that a sale of all, even all assets, is not a liquidation, you have neither a breach of contract nor a breach of anything else nor a breach of fiduciary duty. That's my answer to your question. But to take the point that the other side, I think, has raised here, the change of control is that was the guarantee that the other side has in the document. But the prospectus by which you could look at before you buy this preferred stock, which you might continue to own preferred shares in a company whose common stock is no longer publicly traded, that's set out right there in the prospectus supplement, the possibility that that might happen. So anyone who owns preferred shares understands what they're signing up for. They're getting $1.63 per share per year. And the other side, the preferred shareholders, has continued to receive that dividend on schedule as promised. That's all they're entitled to. So they can't use a breach of fiduciary duty claim to argue that the directors owed a duty to provide them with a conversion right that they did not have under the agreement or a voting right. Let me ask you to explain this. This is the questions and answers that parrot the documents. What are the proposed transactions? This is the answer. The sale of the company, which means Cedar, and substantially all of its assets will be effected by the sale by the company of the portfolio of 33 grocery-anchored shopping centers to grocery-anchored purchasers for the aggregate purchase of $840 million, followed by the acquisition of Wheeler of the company and the balance of the company's assets, the balance transaction that values the remaining portfolio at 291. And then it explains that those two numbers were added together. This is all-cash transaction. This is the way you describe it. And that all-cash transaction is then distributed to all the common stockholders. Now, I don't think it can be any clearer that that's what is being alleged by the plaintiff in this case, although he has trouble placing it where he wants to place it. But that is attached to the complaint. Now, tell me why this is an all-cash transaction. You keep talking about all these assets reserved. They had this, you guys described it as an all-cash transaction, and then you distributed all the cash to the stockholders. So the transaction between Cedar and Wheeler is a cash transaction because Wheeler did not buy the real estate, right? The grocery-anchored properties were sold separately. It says the transfer of the balance of the company's assets in an all-cash merger. That's the second part of the transaction. Yeah, okay. And you are now arguing that that isn't what happened. And I'm suggesting to you that's what the documents show happened. And it seems to me when the directors approve an all-cash transaction and distribute the without honoring the preference of the preferred stockholders, there's a problem. And that's what the complaint alleged. Respectfully, Your Honor, I think we're using all-cash transaction in two different ways. Here's how I understand it. I'm just reading your own documents. Can I just hear his answer for what? So the all-cash transaction refers to the fact that Wheeler is paying cash. In other words, Wheeler is not paying in stock or some other form of consideration. It does not mean that there is nothing left in the company but cash, nor does it mean that all the assets are being distributed. It said Wheeler is acquiring the balance. This is after the first transaction. The balance of the company's assets. Exactly. Wheeler is acquiring it. Yes, it's buying. By way of an all-cash merger. As Mr. Heffner told you correctly, Wheeler owns the stock, the common stock, in Cedar. Cedar continues to own a number of properties. That's the structure that exists today. Cedar is still a corporation. It doesn't have publicly traded common stock anymore, but it does have the preferred stock, and the preferred stockholders continue to get their preferred dividend. That's all that they're entitled to get. The company has not been liquidated, so they don't get a liquidation preference, and there has been no change of control as defined, so they don't get a conversion right. But they keep getting that preferred dividend, which is the primary right. You're making a lot of statements that are totally inconsistent with the questions and answers that the company posed to the public and on which the public acted, and I respectfully submit supported by the documents. You talk as if Cedar is an ongoing transaction when they liquidated all their assets by the loan, which was a full value, and then distributed that. Instead of retaining that cash in the corporation to operate, they distributed it all to the stockholders, and then they canceled the stock. Mr. Heffner and I are both telling you, Your Honor, that Cedar retains some assets. It remains a corporation. Where do I see that in this? In the complaint, the plaintiffs refer to these as the Wheeler properties. Is that right? Yes. And they're described as being the remaining real estate assets owned by Cedar that are beneficially owned by Wheeler because Wheeler owns the one common share or however many common shares exist of Cedar. They're the remain co-assets, if you read the documents. That's what we talk about is the remaining assets. That's exactly right, and the thrust of the other side's argument was that those were not good properties to retain. Which is what counsel just told us. These were the trash properties, but by telling us they're the trash properties, they're admitting there are properties. They might not like them, but they are properties, and they are in Cedar, and Cedar remains an ongoing concern. I think we are all in accord. Maybe not all. So unless the court wants to ask further questions about the wording of the change of control provision, including neither the company nor the acquiring or surviving entity. Maybe you could explain something in the document that I had trouble with. In one paragraph, it says that the preferred stock will get paid upon a liquidation. Yes. And then two paragraphs down, it says a liquidation does not mean the sale of all assets. Yes. So then I look up in Black's Law Dictionary, and it says liquidation means the sale of all assets. It seemed to me, let me just turn to my problem. It seemed to me that one or the other of those clauses has significance, but they both can't live together. They can. Let me explain why. Because if a company sells all of its assets, now the company has a bunch of cash. The company then takes that cash and does something with it. The company continues to be a going concern, and it has not liquidated. So the reason that that clause is in the document is to make clear that if the company sells all of its assets but doesn't distribute the proceeds, that's not a liquidation. A liquidation is when the company ceases to be a going concern and distributes everything. But that isn't the definition that's given in the dictionary or in the document. The dictionary, first of all, let me start again. The definition given in the document is that the sale of all assets is not a liquidation. That's in the two paragraphs down. It doesn't talk anything about going concern. So if I'm a corporation and I own real estate and I sell all my real estate and receive cash and I just keep on as a corporation, that is a liquidation. I have liquidated my assets into cash. And so that's the definition two paragraphs down in the document. It says the sale of all assets is not liquidation. And then above it says upon liquidation. I don't know what liquidation means because you don't give it a consistent definition as you've used it in the document. I disagree, Your Honor. If I refer you to page 339 of the joint appendix, paragraph 4A, first sentence, in the event of any voluntary or involuntary liquidation, dissolution, or winding up of the corporation, referred to here and sometimes as a, quote, liquidation. I'm looking at the word liquidation. Okay. Get the other stuff. So read that without just the word liquidation. In the event of any voluntary or involuntary dissolution or winding up of the corporation. I didn't ask for dissolution. I said liquidation. It's disjunctive. I'm sorry. I thought you asked me to read it without liquidation. Oh, with the liquidation, without the rest. In the event of any voluntary or involuntary liquidation. Right. Right. Okay. So and then as you've pointed out a couple of times, subparagraph E says that a sale of all assets does not constitute a liquidation. And the reason for that is, just as I said, we had a colloquy a moment ago where you said that there was nothing in here about ceasing your business or winding up in the definition of liquidation. It isn't the definition. It's in that sentence from paragraph 4A that I read to you. I know, but that's in the disjunctive. You have to read the language in the disjunctive as if each one has a separate standing. And it says in the event of a liquidation, you have to pay the preferred. I definitely take that point. So the reason that this is all hypothetical, Your Honor, of course, is that they haven't sold all the assets. They still own the Wheeler properties. The statement up here that says that the sale of all the assets to Wheeler, cash sale, that's inaccurate. So Wheeler acquired Cedar and all of its assets. I'm asking you, is that inaccurate, this answer that I just read in the questions and answers? It is not because of what I just said, which is that Wheeler acquired Cedar and all of its assets. Before that sale, the grocery anchored properties were sold off. That was a large chunk of the assets, but not all of them. Chief, can I ask you a question, please? I understand your argument that the surviving and acquiring entity is a single entity and that here, based on the nature of the transaction, you think it's the acquiring entity that we look to. But can you tell me how I determine which of those it is? And would it matter if this was a forward-reverse merger as opposed to the reverse? Does that make a difference in how we think about which entity you think is covered by that phrase? It does not. Your question recognizes our view that the acquiring or surviving entity, that's one entity, whether it acquires or is the survivor by merger. And so the first clause of this subparagraph, which is Clause X, says that when a person acquires control by acquiring 50% or more of Cedar, then you go to Clause Y and you look at whether, among other things, whether the acquiring or surviving entity has publicly traded stock. That entity is the entity that has acquired control, whether by merger, reverse merger, acquisition, or otherwise. But in a forward triangle merger or reverse triangle merger, we're going to look to the acquiring entity parent. But if we had a direct merger, then it might well be the surviving entity that we're looking to? Exactly. If Cedar had merged into Wheeler, I think, and I take this to be undisputed on both sides' view, Wheeler would be the surviving entity. It would be publicly traded and, therefore, there's no change of control. That's, I think, the simplest illustration of why, of how you can tell that the preferred did not bargain for a right to convert just because Cedar itself no longer has publicly traded common stock. The question is whether Cedar or its new owner or its new successor by merger has publicly traded common stock. Here, the new owner has publicly traded common stock. It's written capaciously enough to account for all of these merger forms. Thank you, Chief. Thank you, Mr. Jay. Thank you, Your Honor. Drop. Thank you, Your Honor. May it please the Court.  I'm going to address the claims of breach of the implied covenant of good faith and fair dealing and the two separate tort claims against Wheeler. The preferred stock, as all preferred stock, is a creature of contract, and the contract, in this case, are the articles supplementary. It's a risky investment, but what the preferred stockholders get is a nice dividend, in this case, 6.5% to 7.25% based on the liquidation value. The preferred stockholders continue to get the dividend regardless of what happens with the value of their stock on the stock exchange, and that's true in this transaction here. The preferred stockholders continue to get their dividend. They have certain other rights under the contract. In the case of a liquidation, dissolution, or winding up, they get first dibs on the proceeds, basically. Does it also say that with respect to dividend rights, generally, they get preference? Yes, but this is not a liquidation. I'm not talking about liquidation. It says with respect to dividend rights, they get preference, right? It says, I believe it says, with respect to dividend rights, if there are dividend, there's a liquidation. It says dividend rights and rights upon liquidation. That's correct. But I'm talking about just dividend rights. That's correct. In this case, there was a sale of assets. Let me just ask you what you understand that to mean, dividend rights. What are dividend rights? In this case, if there are dividends... What does it mean when it's used? If there are dividends paid from the operations of the business, the dividends of the preferred always go ahead of the common. Well, that's what I would have read this to mean, too. And so they declared, conceptually, before the merger, they declared a special dividend. They sold assets. Did they declare a special dividend? They did. All right. And that special dividend was $29 a share, right, to common stockholders? I don't believe that's correct. I think the total amount the stockholders got from the transactions combined was $29 a share. That was the way they described the dividend value. They called it a special dividend of $29 a share. You disagree with that? They said there was a special dividend. I believe that the total amount the stockholders got was $29. All right. Now, how did the directors in the company approve paying a special dividend in violation of these dividend rights and not first pay the preferred? So, in this case, there was a sale of assets. The proceeds were distributed. That's not a liquidation. I'm not asking you. Stick with my question. My hypothetical is there was a special dividend declared. I don't care whether it's a dividend every year in December or a special dividend, but a special dividend was declared in this case and all the cash in the company was distributed to the common stockholders. This is before the merger affected. This is conceptually before the merger. It was simultaneous. Not all the assets were sold, Your Honor. Some of the assets were sold. But there was a special dividend. There was a dividend paid, yes. A special dividend. And the special dividend was paid without regard to the preferred stockholders. The special dividend was paid to the common stockholders. Were the preferred shareholders paid their $1.63 that they were entitled to in the year? So, they have a contractual right to a payout. Yes. Right. And so, if there was a debate about their being paid their preferred dividend, the $1.63, is my number right? Is it $1.63? It depends on which class, but yes. Approximately, bear with me. If that had not been paid, then they couldn't make the common shareholder payment. But once that preferred payment is made, there's no additional benefits you get. What the dividend preference means is that if only $1.63 is available to be paid out, it goes to the preferred shareholders. And that's what happened. Not that money over and above the $1.63 goes to the preferred shareholders. That is correct. And they continue to get that preferred dividend. And in every period that's been required, the preferred shareholders have gotten their effective $1.63. And at no point has that been denied them. That's correct. So, the plaintiffs here try to assert that they're entitled to something more, that there's an implied covenant of good faith and fair dealing, that the board of Cedar was required and that Cedar was required to, if it did this transaction, to give them something else outside of their contract. But their contract was fully complied with. They got their dividends. They continue to get their dividends. There was no liquidation. The company continues in force with 19 shopping centers that remain co- or the wheeler properties as they're defined in the complaint. And the change of control provision was not triggered. The breach of the covenant of good faith and fair dealing in Maryland clearly says you don't add terms to the contract. The district court seemed to be arguing to affirm an alternative ground. The district court seemed to rely on this sort of stand-alone cause of action issue. Are you sort of defending that judgment? Are you sort of pivoting and saying maybe for the wrong reasons, but the district court was correct? I'm actually doing both, Your Honor. First of all, I think what they are alleging is a separate action. I do agree that the district court's reasoning, brief though it was, is somewhat inaccurate. Yes. But I am saying that what the plaintiffs are alleging is adding a term to the contract, and you can't do that. And the covenant of good faith and fair dealing in Maryland is clear. While the implied covenant of good faith and fair dealing requires that one party to a contract and not frustrate the other party's performance, it's not understood to impose new obligations about which the contract is silent, even if inclusion of the obligation is thought to be logical and wise. An implied duty is simply a recognition of conditions inherent in express promises, and that's from this court's eastern shore markets decision, and there's similar language in the Edel opinion. But even if you look sort of generally at the phraseology the plaintiffs like, that the preferred stockholders did not get the, quote, fruits of their contract, they did get the fruits of their contract. They have exactly what they were promised under the agreement, and there's no room for implication of a term that says they have to get more than their contract wants. And I get that point. And, of course, preferred shareholders are in a bit of an odd position because, as you rightly point out, essentially their contract is the dividend that's supposed to get paid out to them. They also have an equity position because they bought shares, albeit they're not common shares, and the plaintiffs in this case allege that as a result of this transaction, their value, the value of their preferred shares has significantly decreased, while the common shareholders, including the folks that they allege to be conflicted directors and officers, have profited handsomely from this deal. Is there anything inequitable or a breach of fiduciary duty that that describes? I do not believe so, Your Honor. Clearly not under Maryland law. The duties of the directors in Maryland are to the corporation. They're to maximize the value for the common stockholders. I'm not sure I agree with you that the preferred stock is somehow or inequity. It does trade on the exchange, but it's a contract right, and they're creatures of contract. People buy them. They're risky investments. The dividend is very nice. It's paying 7% when the interest you can get from the bank is less than 1%, but there's a risk, and the risk here is that this transaction will happen, and their contract clearly says that none of a merger or sale of assets is a liquidation, and that's the deal they bought into. I don't think it's inequitable. That's what their contract says. If the court has any questions, I'm over my time. Any questions about the Wheeler claims against Wheeler? I believe the interference with contract claim and aiding and abetting the You can't have those tort secondary claims, and in any event, all the allegations of the complaints say are that Wheeler met with somebody from Cedar and that they proposed this transaction in which the Cedar preferred stock will remain outstanding as stock of Cedar, and Cedar will continue to own 19 shopping centers and continue as an operating company being owned. It's common stock owned by Wheeler, and that's where we are today. All right. Thank you, Mr. Proop. Mr. Heffner? Thank you, Your Honor. First of all, with respect to one of the last arguments, in Maryland directors of corporations owe fiduciary duties to all stockholders, not just common stockholders. Section 2-405.1C says they're owed to the corporation and the stockholders, which is not limited to common stockholders. Preferred shareholders are stockholders of a Maryland corporation. There's no doubt that they're owed some fiduciary duties, right? So if the directors stole universally all the money, so they stole it from common shareholders and preferred shareholders, in that scenario we might think that they breached the fiduciary duty to both. And so there's no doubt there's some fiduciary duty, but the question is does that fiduciary duty extend beyond their contractual rights in this context? And the case law seems to suggest no. You point to maybe it's Plank or whatever it is, which is not obviously addressing the preferred shareholders case. Do you have a case that you'd like for me to read that suggests that preferred shareholders have the broad fiduciary duty that you've alleged? What would you like for me to read? There is no case directly on point with this situation. What I would like you to read, though, is the very case that the defendants have cited. They cite it for the fact that it's limited, in their view, to this narrow issue of whether or not we can perform under the contract. We say look at that same case. Which case is it? It's Eastern Shore Markets. It was written by a genius of a judge, Niemeyer. And it was – I don't know if that helps. It was – One out of three doesn't get you very far. In Section 4 of that opinion, it lays out what the fiduciary duty standards are, and it does enunciate – Does it address preferred shareholders at all? It's not about preferred shareholders, right? It is not. The challenge I've got is we've got all these cases that talk about the difference for preferred shareholders, including Maryland cases and their reliance on their Delaware counterparts. And what I don't see is any case from you that suggests that that line of cases, treating the fiduciary duties of preferred shareholders differently, given their contractual rights, nothing that you've given me undermines those cases, right? And I'm trying to predict what Maryland's going to do. Correct. Right? And so I've got all these Maryland cases saying what your colleagues have suggested, and you're not giving me anything to say that they're wrong. My colleagues have not given you a case directly on point that says that the preferred shareholders aren't owed a fiduciary duty beyond the article supplementary. There are quite a few that suggest that. Maybe they're not on all fours, but they're quite good. And the Eastern Shore decision says that it's an issue of the fruits of the contract. Have they done something to interfere with the fruits of the contract? And I would note that it's also a matter of intentionality. We aren't arguing in this case that the defendants put together a transaction for a legitimate business purpose that happened to short us and give us nothing in what was essentially a liquidation. We're arguing that they intentionally did it so that the defendants could benefit from it to the tune of $40 million. That is a breach of fiduciary duty. That is an intentional harm to a beneficiary that a fiduciary owes. So, Your Honor, you're right. We haven't cited a specific case. We are relying on the proposition that this is – I'm sorry to interrupt you, but when you say they did it intentionally, that's obviously true. They stated it. That's correct. But that doesn't really get you very far. This wasn't an accidental transaction. Correct. They negotiated this transaction. They thought about it. But where is the sinister intent, I guess, is what you're getting at? Where's the evidence? Where are the allegations that suggest that? You've just stated it, Your Honor. The allegations are that they put this deal together so that they could have this remain co-entity and push it off because they knew they went – it's in the complaint. I don't know how much we've gone over it in the briefs. But the history of this is they went out and announced, we think we can get double what our stock price is trading for. And we allege they went out into the market and they found out, oh, no, they couldn't. And so what they did is they pivoted and they tried to figure out a way to freeze out our preferred shareholders to make sure they didn't have to pay them the liquidation dividend, even though they were going to liquidate the company in effect. And so they came up with this transaction to do it. That's what we allege is the breach of fiduciary duty. And that's what we allege is the, quote, sinister intent. And it was driven by the fact that they had a financial interest. And in their documentation, they described the $29 as the liquidation dividend. They used the word liquidation. And I'd like to pivot to there's one point in the defendant's brief on this issue. They have pivoted to calling the surviving corporation Wheeler. They didn't argue that below. They said the surviving, they were different corporations. It was that the acquirer was Wheeler. And by the way, the acquirer technically is not the Wheeler with publicly traded stock. They used a merger sub, LLC, that did not have publicly traded stock, and then merged it through. But we know that the first provision isn't that limited, right? Which provision? The X or Y, whatever the first one is, because it says did they acquire directly or indirectly beneficial ownership? Okay. Right? I mean, that's the provision that tells us it doesn't matter whether we got merger sub, right? You have an alleged merger sub as the acquiring entity, and you haven't because it wouldn't make sense given the first provision, X. Ah, that's fantastic. But do you agree with that before you try to? Yes. Right. You agree. The argument you were just making doesn't work. I'm saying it's ambiguous on its face if you look at just that term. And what you just said is correct. You have to go to other portions of the document to figure out what that means, other portions of that very section. And that's exactly what our argument is on the change of control provision, about whether or not the surviving entity has to own common stock. You have to figure it out, not just from what it says there. You have to look at the whole contract. And you don't have to go far. You do not have to go far. You go further down in the provision, and it says that in the case of a change of control that involves a merger with stock and cash, that you have to look at the common share trading price. My colleague on the other side did not answer that question. That portion of the contract is written out. It cannot be used when the company, as it is now, is a privately held company that is not publicly traded. It wouldn't apply in a direct merger either. Right? I mean, I get it's like a little bit sloppy. Right? But that doesn't mean we read out the other provision. Which provision? Right? With that provision, you're talking about the price provision? Yes. Like that also exists if Cedar just was merged directly into Wheeler. If Cedar was directly merged into Wheeler, we wouldn't have this issue. We wouldn't have the issue of the common share. Do you agree the provision you're talking about would not be workable in that scenario either because Cedar would not have publicly traded? Oh, it certainly would. No, no, it certainly would. If it was merged into Wheeler, then that would be the surviving entity. The surviving entity would be Wheeler, and as you go forward with that change of control provision, you would look at that. All right. Thank you, Mr. Heffner. I appreciate the arguments on both sides. It's been quite lively, and it's confirmed for me that I will continue to hold my meager wealth in mutual funds. We'll come down to Greek Council and move on to our second case.
judges: Albert Diaz, Paul V. Niemeyer, Julius N. Richardson